UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JUSTIN WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 23-CV-0008-CVE-JFJ |
| | ) | |
| JUSTIN ANDERSON, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Before the Court is defendant Justin Anderson's motion for summary judgment (Dkt. # 53)[1],

plaintiff Justin Walker's response (Dkt. # 49), and defendant's reply (Dkt. # 58).  This case arose out

of an incident that took place on November 25, 2021, in which plaintiff was arrested for obstructing

an officer.  Defendant argues that he is entitled to qualified immunity because he used reasonable

force when detaining plaintiff and had probable cause to arrest plaintiff for obstructing an officer.

Plaintiff responds that defendant is not entitled to qualified immunity because he used excessive

force when performing a takedown maneuver and conducted an unlawful arrest in violation of

plaintiff's Fourth and Fourteenth Amendment rights.

**I.**

On November 25, 2021, Thanksgiving Day, a 911 dispatcher received a call from a woman,

Cici, regarding a domestic disturbance.[2]  Dkt. # 53-5, Dkt. # 53-6.  Cici reported that her sister-in-

---

[1]     Defendant's originally filed motion for summary judgment (Dkt. # 46) contained improperly hyperlinked exhibits.  It was therefore stricken and he was directed to re-file his motion.  See Dkt. # 51.  The Court cites exclusively to the re-filed motion at Dkt. # 53.

[2]     For a complete description of the events of November 25, 2021, the Court includes a narrative description of the contents of the video recordings contained in the summary judgment record.

law, Julie Walker, and Walker's husband, plaintiff, were fighting at their[3] house at 16842 West 41st Street.  Dkt. # 53-6, at 2.[4]  Cici reported that plaintiff "may have hit [Julie] on accident."  Id.  Cici explained that plaintiff and his wife had been fighting about getting a divorce and that plaintiff was "saying that everybody's treating him like crap."  Id. at 3.  Cici noted multiple times that plaintiff had been drinking and that alcohol had contributed to the altercation.  Id. at 3, 6.  The dispatcher remained on the phone with Cici for approximately eight minutes.  Toward the end of the call, Cici reported that plaintiff was now physically separated from his wife, but that there was still hollering and screaming occurring at the house and in the driveway.  Id. at 5.  The dispatcher advised Cici, who was now sitting in her pickup truck at the end of the house's driveway, to remain where she was so she could speak to officers as an uninvolved party to the fight.  Id. at 4, 7.  The dispatcher started a medical response because she was uncertain whether Julie needed medical attention.  Id. at 4.

While on the phone with the 911 caller, dispatch assigned defendant,[5] who was working his regular patrol shift, to 16842 West 41st Street.  Dkt. # 53, at 10; Dkt. # 49, at 8.  The dispatcher reported over the radio to defendant that a "domestic [is] in progress" and to "be advised that [Cici's]

---

[3]     Cici reported to dispatch that plaintiff had told her to get off of "his" property.  Dkt. # 53-6, at 4.  Dispatch asked whether it was his house and Cici responded "[i]t's both of their house. Id.  Dispatch later asked Cici, "do you know if your sister-in-law, [Julie] will leave?"  Cici responded "it's actually her house, so [plaintiff] would probably be the one that needs to leave."  Dkt. # 53-6, at 5.

[4]     The Court reviewed the transcript of the 911 call and compared it to the audio recording, and finds that it accurately transcribes the call.  See Dkt. # 53-5; Dkt. # 53-6

[5]     Defendant is a certified law enforcement officer in Oklahoma, and has been a deputy with the Tulsa County Sheriff's Office since 2018. Dkt. # 53, at 9.  He is also cross-deputized with the Cherokee Nation and the Muskogee (Creek) Nation Light Horse Police Department.  Id.

2

sister and her husband are physically fighting at the moment." Dkt. # 53-7, at 0:08-0:09; 0:14-0:17.

The incident run sheet recites:

| Date | Time | Comment |
|------|------|---------|
| 11/25/2021 | 14:35:34 | RP [reporting party] ADV HER SISTER AND HUSBAND ARE PHYSICALLY FIGHTING |
| 11/25/2021 | 14:36:00 | HUSBAND IS JUSTIN WALKER IS HITTING HIS WIFE JULIE WALKER |
| 11/25/2021 | 14:36:10 | JUSTIN HAS BEEN DRINKING |
| 11/25/2021 | 14:36:36 | RP ADV THEY ARE GETTING A DIVORCE AND ADV HE BELIEVES EVERYONE IS TREATING HIM LIKE CRAP |
| 11/25/2021 | 14:36:44 | ALL ARE OUTSIDE... NO WEAPONS |
| 11/25/2021 | 14:36:57 | EVERYONE IS OUTSIDE TRYING TO BREAK IT UP |
| 11/25/2021 | 14:37:03 | B5 RUNNING CODE |
| 11/25/2021 | 14:37:21 | RP ADV JULIES DAD IS OUT THERE TRYING TO BREAK IT UP |
| 11/25/2021 | 14:37:36 | RP STATES SHE DOESNT KNOW IF WE NEED MEDICAL... STARTING MEDICAL |
| 11/25/2021 | 14:38:11 | EMSA STAGING |
| 11/25/2021 | 14:38:37 | THEY ARE SEPARATED AT THE MOMENT... THEY ARE ALL STILL 97 |
| 11/25/2021 | 14:39:19 | RP STATES THEY ARE STILL ACTIVE JUST NOT PHYSICAL... STILL SCREAMING ANO YELLING |
| 11/25/2021 | 14:39:26 | PER B10 EVERYONE DROP OUT OF CODE |
| 11/25/2021 | 14:39:50 | RP WILL BE ACROSS THE STREET IN A BLUE DODGE TRUCK... SHE ADV JUSTIN IS TELLING EVERYONE THEY NEED TO LEAVE |
| 11/25/2021 | 14:40:30 | SISTER IS NOT LEAVING SHE SAID... SHE WILL NOT LEAVE HER PROPERTY |
| 11/25/2021 | 14:41:19 | SHE ADV SHE IS NOT LEAVING JUST BECAUSE HE WANTS HER TO OR US |
| 11/25/2021 | 14:41:35 | STLL [sic] NOT PHYSICAL AT THIS TIME |
| 11/25/2021 | 14:41:51 | SHE DOES HAVE MARKINGS ON HER FACE |
| 11/25/2021 | 14:42:20 | JUSTIN DRIVES A BLACK CHEVY TRUCK 3500 BUT HAS NOT LEFT BUT IF HE DID THAT WOULD BE THE VEH HE WOULD LEAVE IN |
| 11/25/2021 | 14:44:08 | NO LONGER PS SINCE WE ARE 97 |

Dkt. # 49-6, at 2; Dkt. # 53, at 8.

Defendant arrived at the entrance to the long driveway of a property located in a rural area in west Tulsa County. Dkt. # 53, at 10; Dkt. # 49, at 8. The parties dispute what occurred next. Defendant claims that he spoke briefly to Cici, who provided a description that the man–plaintiff–suspected of hitting his wife, was the person standing in the driveway in a western shirt and ball cap. Dkt. # 53-2, at 16. Plaintiff denies that this conversation occurred because defendant had not yet started his body-worn camera. Dkt. # 49, at 8. Plaintiff, however, has not

provided any evidence refuting that defendant obtained a description of plaintiff, confirming the 911 call.

Defendant, wearing his uniform,  pulled into the driveway and activated his body-worn camera and audio.[6]  Plaintiff and his stepson, Nathan, were standing outside in the middle of the gravel driveway. Dkt. # 53-4, at 0:45.  Defendant stepped out of his patrol car and approached them. Id.  Defendant told them that he had received a report that "somebody's beating on somebody else" and inquired into what was "going on." Id. at 0:47-0:51.  Plaintiff responded, "well, there ain't nothing, so you can get off my property and call it good," and gestured away from the house.  Id. at 0:51-0:54.  Defendant responded, "okay, no, that's not how this works," and was interrupted by plaintiff, gesturing again, "no, it does, because there ain't nobody beat.  Do you see anybody laying bloody?  I know how the law works.  Get your shit, get in your truck." Id. at 0:55-1:02.  In his deposition, defendant stated that "[plaintiff] was intoxicated." Dkt. # 53-2, at 13.

Defendant explained why he and the other officers were there.  Dkt. # 53-4 at 1:03-1:10. Plaintiff questioned who told defendant that a woman had been hit, and defendant stated that he did not have to show him that information.  Id. at 1:11-1:13.  Plaintiff argued that defendant had to show him the dispatch call by law, and then pointed at defendant again and stated "get the fuck off my property." 1:14-1:17.  Plaintiff then turned his back to defendant and began to walk away from him. Id. at 1:18-1:20.  Defendant instructed plaintiff multiple times to stop, and he did not.  Id. at 1:20-1:22.  Defendant then instructed him to place his hands behind his back, and plaintiff continued to

---

[6]     The Court has compared the body-worn camera footage with the transcript of the video and finds that the transcript is accurate.  Dkt. # 53-4, Dkt. # 53-8.

protest "no" and "you can't arrest me." Id. at 1:22-1:25.  Defendant handcuffed plaintiff and told him that he was not under arrest, just detained.  Id. at 1:26-1:42

Plaintiff protested that defendant could not detain him, and yelled at Nathan to begin recording the interaction on his phone.  Id.  Defendant again stated to plaintiff that he was being detained.  While plaintiff protested, defendant escorted him toward the patrol car and instructed plaintiff to stand in front of the vehicle.  Id. at 1:41-1:48.  Plaintiff became increasingly agitated, and stated, "I promise you, bud, [] with me fucking retiring from the fire department, I swear to God, you're not going to like the outcome of this . . . .  All right, yeah, you can't come on my property and just fucking put me in cuffs.  There ain't nobody bleeding in my fucking drive or nothing else.  I don't know where the fuck y'all got the call, I asked you for it.  You cannot put me in cuffs!  Y'all know it.  No, fuck you, dude, you guys get off my fucking property! . . . Fuck you!"  Id. at 1:48-2:11.[7]  Defendant began to search plaintiff's pockets, and said to the other officer, "okay, we've got his son right here, he's wanting to record the thing" and plaintiff interrupted, yelling,  "yeah, he is recording it because this is all bullshit and you can't fucking do it!"  Id. at 2:11-2:13.  He then yelled out "hey Julie!  They put me in cuffs because they said I hit a woman!"  Id. at 2:11-2:22.

Plaintiff began pulling away from defendant, and yelled towards the house again, "hey, tell them they cannot come on the property and fucking do this!"  Id. at 2:22-2:23.  Defendant grabbed plaintiff's arm and instructed him to "stop."  Dkt. # 12, at 0:53.  At this point, defendant was standing behind plaintiff and escorting him around the front of the patrol car.  Id.  Plaintiff responded

---

[7]     Plaintiff repeatedly interrupted defendant, who stated during plaintiff's comments, "okay, that's fine" and "right now [] you don't want to listen and I won't . . . ."  Dkt. # 53-4, at 1:48-2:11.

5

"man, fuck you dude" and quickly arched his back and lunged forward, away from defendant.[8]  Id.
at 0:53-0:55.  Defendant immediately wrapped his arms around plaintiff and pulled him down to the
grass area adjacent to the gravel driveway.  Id. at 0:55-0:57.  Defendant exclaimed  "stop" and "do
not do this" while he pulled plaintiff down.[9]  Id.  Plaintiff, then on his stomach in the grass, laughed
and said, "this was the best thing you could have done, I promise you."  Dkt. # 52-4, at 2:37.
Plaintiff alleges that he suffered fractured[10] ribs as a result of the takedown maneuver.[11]

Defendant then checked plaintiff's handcuffs and helped him back to his feet before leading
him into the patrol car.  Id. at 2:40-3:08.  Defendant arrested plaintiff for obstruction of an officer,

---

[8]     In the video, it appears that plaintiff attempted to hit defendant with his body as he jerked
        away.  Plaintiff claims that he jerked back as a reaction to the "pain he felt from [defendant]
        wrenching his arm, causing the handcuffs to pinch."  Dkt. # 49, at 13.  However, the video
        does not support that defendant was wrenching plaintiff's arm.  Dkt. # 12, at 0:51-0:53.

[9]     The parties dispute how plaintiff was taken down, and the actual moment he is brought to
        the ground is not fully visible on either the body-worn camera or Nathan's recording.
        Defendant claims that he used a "balance or weight displacement" technique, which he was
        trained to do when someone actively resists arrest.  Plaintiff claims defendant slammed him
        to the ground, but does not dispute that he was brought down in a takedown maneuver.
        Neither party disputes that defendant's maneuver brought plaintiff to the ground on his
        stomach, nor does either party dispute that plaintiff's ribs were fractured as a result of the
        maneuver.

[10]    Plaintiff has interchangeably claimed that he suffered broken ribs and fractured ribs from the
        fall.  See Dkt. # 49, at 7; Dkt. # 49, at 13; Dkt. # 49, at 24.

[11]    Plaintiff also includes an expert report, which he argues supports his contention that
        defendant used excessive force when he performed the takedown maneuver.  See Dkt. # 49-
        8, at 2-15.  However, this expert report does not present any genuine issue of material fact;
        the expert simply analyzes the video and depositions and police practices and makes a
        determination that defendant used excessive force.  Medina v. Cram, 252 F.3d 1124, 1133
        (10th Cir. 2001)("The expert's affidavit does not, however, highlight a disputed issue of fact;
        rather, it simply contains the ultimate conclusion that the officers' use of force did not
        conform with accepted police guidelines and practices and was, therefore, excessive.").  The
        Court has reviewed the expert report and finds that it is insufficient to highlight a disputed
        issue of fact; it simply contains an ultimate conclusion similar to that in Medina.

pursuant to OKLA. STAT. tit. 21, § 540 (2021), and transported him to jail.[12]  Dkt. # 53, at 14; Dkt. # 53-9, at 2.  Defendant alleges that plaintiff continued to be defiant and noncompliant when defendant booked plaintiff into jail and attempted to get him medical attention.  Dkt. # 53, at 14.  Plaintiff denies that he acted defiantly at the jail.[13]

Due to plaintiff's status as a Chickasaw Nation citizen, the case was referred to the Muskogee (Creek) Nation.  Id.  Based on the summary judgment record, it is not clear with which crime plaintiff was ultimately charged.[14]  On March 21, 2022, the prosecuting attorney filed a motion to dismiss the case because the complaining witness did not want to move forward.  Dkt. # 53-13, at 2.  The case was dismissed.

On January 6, 2023, plaintiff filed a complaint against defendants Vic Regalado, in his official capacity as Tulsa County Sheriff, and Justin Anderson, in his individual capacity as an officer/employee of the Tulsa County Sheriff's Office.  Dkt. # 2.  The complaint alleged six claims for relief:  a 42 U.S.C. § 1983 claim against Anderson for excessive force in violation of the Fourth

[12]     After plaintiff was arrested and placed in the back of the patrol car, officers spoke with others on the property and confirmed that Julie Walker had no "marks" on her and that "nobody saw anything [with regard to whether she was hit]."  Dkt. # 53-8, at 12.

[13]     Plaintiff relies on a jail video documenting his interaction with defendant and other officers to dispute defendant's allegation.  However, this video has no sound, so it is unclear what either plaintiff or defendant stated.  The interaction appears unremarkable except for one instance where plaintiff kneels down and officers appear to instruct him to stand back up.

[14]     Defendant claims a prosecuting attorney of the Muskogee (Creek) Nation filed a criminal complaint and information on January 31, 2022, charging plaintiff with domestic assault and battery pursuant to MCNCA Title 6 § 3-301.  Dkt. # 53, at 15.  However, the criminal complaint and information are not included as exhibits, and the motion to dismiss plaintiff's charges does not refer to the statute with which plaintiff was charged.  See Dkt. # 53-13, at 2-3.  Additionally, plaintiff denies that he was charged with domestic assault and battery.  Dkt. # 49, at 10.

Amendment to the United States Constitution (count one); a municipal liability claim against Regalado arising from Anderson's alleged actions (count two); a municipal liability claim against Regalado for failure to train or supervise (count three); punitive damages against Anderson arising from alleged excessive use of force (count four); an Oklahoma state law claim for negligence against Regalado and Anderson (count five); and a 42 U.S.C. § 1983 claim against Anderson for unlawful arrest in violation of the Fourth and Fourteenth Amendments to the United States Constitution (count six). Dkt. # 2, at 3-9. Defendants Regalado and Anderson filed a motion to dismiss some of plaintiff's claims, and plaintiff filed a response along with a "notice of dismissal," which dismissed all claims against Regalado and the municipality and terminated Regalado as a party defendant. Dkt. # 18, at 2. The Court entered an Opinon and Order (Dkt. # 18) mooting all claims against Regalado, dismissing counts five and six against Anderson without prejudice, and dismissing count four for failure to state a claim. Dkt. # 18, at 8. Count one was plaintiff's sole remaining claim, but the Court granted plaintiff leave to amend his complaint with additional facts in support of his unlawful arrest claim. Id.

On May 18, 2023, plaintiff filed an amended complaint alleging three claims for relief: a claim against Anderson for excessive force in violation of the Fourth Amendment (count one); a § 1983 claim against Anderson in his individual capacity for use of excessive force in violation of the Fourth and Fourteenth Amendments (count two); and a claim for unlawful arrest in violation of the Fourth and Fourteenth Amendments to the United States Constitution (count three). Dkt. # 25, at 4-7. Defendant filed a motion for summary judgment on July 2, 2024, based on the defense of qualified immunity. Dkt. # 46; Dkt. # 53. Plaintiff filed a response (Dkt. # 49) and defendant filed a reply (Dkt. # 58).

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317.  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action."  Id. at 327 (internal quotations omitted).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiffs position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 250.  In its review, the Court

construes the record in the light most favorable to the party opposing summary judgment.  Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

Defendant seeks summary judgment on plaintiff's § 1983 claims as alleged in the amended complaint.[15]  Defendant argues that he is protected by qualified immunity for both claims because his use of a take down maneuver was objectively reasonable under the circumstances, and because plaintiff has failed to establish that his constitutional rights were violated by defendant's conduct.  He also asserts that the initial handcuffing was an investigatory detention, but that, regardless, he had probable cause to effectuate the arrest for obstruction of an officer based on plaintiff's conduct.  Plaintiff claims that defendant is not entitled to qualified immunity because his takedown maneuver constituted excessive force that was unjustified under the circumstances.  He also argues that defendant had no independent basis to believe that a crime had occurred before arresting plaintiff.

Section 1983 provides a cause of action against any "person who, under color of statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any

---

[15]    The Court granted plaintiff leave to amend his complaint to provide additional facts for his § 1983 claim for unlawful arrest in violation of the Fourth and Fourteenth Amendments.  Thus, plaintiff's amended claims should have been a § 1983 claim for excessive force in violation of the Fourth Amendment, and a § 1983 claim for an unlawful arrest in violation of the Fourth and Fourteenth Amendments.  However, plaintiff's amended complaint alleges three claims for relief, and appears to improperly plead a standalone claim for a violation of the Fourth Amendment for excessive force (count one), along with a § 1983 claim for an excessive force violation of the Fourth and Fourteenth Amendments (count two).  The Court will construe these two counts as one § 1983 claim for excessive force in violation of the Fourth Amendment, since plaintiff was not granted leave to amend this claim, and the Fourteenth Amendment does not apply to the facts here.  See Est. of Booker v. Gomez, 745 F.3d 405, 421 (10th Cir. 2014) ("Accordingly, we hold the Fourteenth Amendment standard governs excessive force claims arising from post-arrest and pre-conviction treatment if the arrestee has been taken into custody pursuant to a warrant supported by probable cause.")

citizen of the United States . . . the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  "The purpose of § 1983 is to deter state actors from using the badge of authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."  Wyatt v. Cole, 504 U.S. 158, 161 (1992). The Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

Qualified immunity shields public officials from facing the burdens of litigation and is an immunity from suit, not simply a defense to a plaintiff's claims.  Serna v. Colorado Dept. of Corrections, 455 F.3d 1146, 1150 (10th Cir. 2006).  The Tenth Circuit requires the plaintiff to meet a two-step burden to demonstrate that the defendant is not entitled to qualified immunity.  Burke v. Regalado, 935 F.3d 960, 1002 (10th Cir. 2019).  A plaintiff must show that the defendant's actions violated a specific constitutional right, and, if the plaintiff has shown that a constitutional violation occurred, the plaintiff must show that the constitutional right was clearly established when the conduct occurred.  Toevs v. Reid, 685 F.3d 903, 909 (10th Cir. 2012).  Plaintiff bears the burden to prove that his constitutional rights were violated and that the law giving rise to his claims was clearly established at the time the acts occurred.  Cox v. Glanz, 800 F.3d 1231, 1246 (10th Cir. 2015); Medina, 252 F.3d at 1128.

**A.      Plaintiff's § 1983 claim for excessive force in violation of the Fourth Amendment**

Plaintiff argues that defendant is not entitled to qualified immunity because his takedown maneuver violated clearly established law.  Plaintiff entirely fails to address the first prong of whether defendant violated plaintiff's constitutional rights by the use of excessive force.  Despite the fact that it is plaintiff's burden to establish that defendant's conduct violated plaintiff's constitutional rights, the Court will nevertheless address both prongs of the two-step approach to facilitate a fair disposition of the case.  See Pearson v. Callahan, 555 U.S. 223, 242 (2009) ("Because the two-step Saucier procedure is often, but not always, advantageous, the judges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case.") (citing Saucier v. Katz, 533 U.S. 194 (2001)).  The Court will first address whether defendant used excessive force in violation of the Fourth Amendment.

1.      Whether defendant violated plaintiff's Fourth Amendment rights by use of excessive force

The Fourth Amendment governs claims concerning the use of force for a warrantless arrest before a probable cause hearing has been held.  Gomez, 745 F.3d at 419.  In Graham v. Connor, 490 U.S. 386 (1989), the Supreme Court set out the standards governing excessive force claims under the Fourth Amendment, and as a general matter explained that the reasonableness of the force used requires a "balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  Id. at 396 (internal quotations omitted).  The reasonableness of the use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight," and not

"every push or shove . . . violates the Fourth Amendment." Id.  The Court must consider factors such as the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Estate of Ceballos v. Husk, 919 F.3d 1204, 1213 (10th Cir. 2019).  The reasonableness inquiry is wholly objective and "an officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force . . . ." McCoy v. Meyers, 887 F.3d 1034, 1045 (10th Cir. 2018).  The use of force may become unreasonable, even if the use of force is initially appropriate, if the person being detained is no longer a threat to the safety of police officers. Dixon v. Richer, 922 F.2d 1456, 1463 (10th Cir. 1991).

a.  Severity of the crime

The Tenth Circuit has established that a crime is considered severe when that crime is a felony or if it involves violent conduct. Vette v. K-9 Unit Deputy Sanders, 989 F.3d 1154, 1170 (10th Cir. 2021) ("But our binding precedent indicates the first Graham factor weighs against the plaintiff when the crime at issue is a felony, irrespective of whether that felony is violent or nonviolent"); Ibarra v. Lee, No. 22-5094, 2023 WL 6939236, at *10 (10th Cir. Oct. 20, 2023) ("A felony or violent conduct justifies more force.").[16]  When defendant was dispatched to plaintiff's house, he was told that there was an ongoing domestic violence incident.[17]  "Under Oklahoma law,

---

[16]   This and other cited unpublished decisions are not precedential, but may be cited for their persuasive value. 10th Cir. R. 32.1(A).

[17]   Plaintiff did not assess the Graham factors in his response, and therefore failed to advance an argument that the crime at issue could be obstruction of an officer rather than domestic violence.  Regardless, the Tenth Circuit has recently held that even when parties concede that the crime of obstructing an officer is the relevant crime for this first prong, courts cannot disregard the crime that the officers were initially investigating. Andersen v. DelCore, 79 F.4th 1153, 1164 (10th Cir. 2023) (finding that the severity of crime factor weighed in

domestic abuse may be a misdemeanor or a felony, depending on the circumstances."[18] Huntley v. City of Owasso, 497 F. App'x 826, 830 (10th Cir. 2012) (citing OKLA. STAT. tit. 21, § 644 (2023)[19]). While the incident run sheet recites that there were no weapons involved and that plaintiff and his wife had been separated, defendant was also informed that plaintiff was drunk, that his wife had markings on her face, and that a medical unit had been dispatched. DelCore, 79 F.4th at 1164 ("As part of [the first factor] inquiry, we may properly consider whether exigent circumstances supported the need for prompt action by law enforcement."). Faced with a complaint of domestic violence, coupled with the report that a medical unit was on its way, the severity of the crime factor weighs in favor of defendant.

> b.      Level of threat

If a suspect poses "an immediate threat to the safety of the officers or others," increased force is appropriate. Mglej v. Gardner, 974 F.3d 1151, 1168 (10th Cir. 2020). "Under the second factor, an officer may use increased force when a suspect is armed, repeatedly ignores police commands, or makes hostile motions towards the officer or others." Donahue v. Wihongi, 948 F.3d 1177, 1196 (10th Cir. 2020). The Tenth Circuit has also considered factors such as whether the suspect is intoxicated and the nature of the crime officers are investigating. See Huntley, 497 F. App'x at 830 ("In their training, the officers had been told that 'domestic violence calls are among the most

---

officer's favor since he was investigating the crime of child abuse, despite that the misdemeanor crime of obstructing an officer is the crime for which the suspect was arrested).

[18]    Because defendant responded as an officer of the Tulsa County Sheriff's Office, and was unaware of plaintiff's status as a Chickasaw citizen at the time of the incident, the Oklahoma domestic abuse statute is applicable.

[19]    This statute has since been amended. See 2024 Okla. Sess. Law Serv. Ch. 38 (S.B. 1211) (West). However, it was in effect at the time of the incident.

dangerous for officers to handle because of the emotionally unstable condition of the participants and the unpredictability of their behavior.'"[20]); Novitsky v. City Of Aurora, 491 F.3d 1244, 1255 (10th Cir. 2007) ("Because individuals who are intoxicated are often unpredictable, [the officer] was confronted with an additional layer of uncertainty.").  When evaluating this second factor, courts must consider the level of threat posed at the precise time the officer used increased force.  See Vette, 989 F.3d at 1171.  The Court will rely on the video evidence and not either party's characterization of the events in assessing the level of threat.  See Fields v. City of Tulsa, Oklahoma, No. 21-CV-0179, 2022 WL 17486846, at *4 (N.D. Okla. Dec. 7, 2022), aff'd, No. 23-5001, 2023 WL 8643188 (10th Cir. Dec. 14, 2023).

The video evidence shows that, from the outset of their interaction, plaintiff was intoxicated, hostile, refused to answer questions, and gestured aggressively at defendant.  Despite that, defendant placed plaintiff in handcuffs–without using any increased force–to temporarily detain plaintiff and investigate whether Julie Walker was injured.  Plaintiff indeed posed less of a threat towards officers, and others in the house, once he was handcuffed.  However, it was not until plaintiff jerked quickly at and away from defendant–while yelling expletives directed at defendant–that defendant used a takedown maneuver to bring plaintiff back under control.  See DelCore, 79 F.4th at 1165 (finding that an officer's use of force by grabbing a suspect's wrist "was relatively small and consistent with his right to take reasonable measures to effect an arrest").  Defendant's use of force corresponded to the level of threat imposed by plaintiff in that precise moment.  By not analyzing the Graham factors, plaintiff has failed to advance any other arguments that contravene that he posed a threat to officers.

---

[20]    Defendant has similarly provided evidence that officers face increased risk when responding to domestic violence calls.  See Dkt. # 53-3, at 5

He vaguely declares that defendant admitted in his deposition that he was not threatened by plaintiff. Dkt. # 49, at 20.  However, that is not supported by the evidence in the record.  Defendant stated in his deposition that he was threatened by plaintiff due to his intoxicated state and refusal to comply with the officer's directions.  Dkt. # 53-2, at 22-24.  Because the maneuver corresponded with the level of threat imposed by plaintiff, the Court find this factor narrowly weighs in favor of defendant.

### c.    Flight risk and evading arrest

The final factor considers whether the suspect is actively resisting arrest or attempting to evade arrest by flight.  Husk, 919 F.3d at 1213.  "Like the second factor, when evaluating the third factor we consider whether the plaintiff was fleeing or actively resisting at the precise moment the officer employed the challenged use of force."  Vette, 989 F.3d at 1171 (internal quotations omitted). We have found this third factor to weigh in favor of 'some degree of physical coercion or threat,' when an individual refuses to obey an officer's lawful orders[.]"  DelCore, 79 F.4th at 1165 (quoting Graham, 490 U.S. at 396).  Defendant gave plaintiff numerous opportunities to speak with him about the allegations, or at least allow the officers to investigate the call.  Instead, plaintiff's attitude towards the officers was dismissive, and he became increasingly hostile as the interaction continued. He turned his back on the officers and walked away, he protested aggressively when defendant placed him in handcuffs, and then he jerked away using force while defendant commanded him to stop. A reasonable officer in the same circumstances would interpret plaintiff's last action, along with the expletives accompanying his action, as an attempt to evade arrest.  Defendant's use of force also followed the precise moment plaintiff resisted arrest.  The use of force and the amount of force used was reasonable under the circumstances, and plaintiff has not shown that defendant acted unreasonably in light of plaintiff's actions.

16

2.      Whether defendant violated clearly established law when using the takedown
maneuver

Even if the Court concluded the facts precluded summary judgment on the excessive force

claim, that right was not clearly established.  Plaintiff bears the burden of demonstrating that "the

contours of the right [are] sufficiently clear that a reasonable official would understand that what he

is doing violates that right."  Thomas v. Kaven, 765 F.3d 1183, 1194 (10th Cir. 2014).  "He must

point to a Supreme Court or Tenth Circuit opinion—or 'the clearly established weight of authority

from other courts'—holding that use of force is excessive in analogous circumstances." Fields, 2023

WL 8643188, at *4 (citing Kaven, at 1183).

Plaintiff relies on two cases to argue that defendant's use of the takedown maneuver violated

his clearly established Fourth Amendment rights.  First, he cites McCoy v. Meyers, 887 F.3d 1034

(10th Cir. 2018), for the proposition that "the use of force on effectively subdued individuals violates

the Fourth Amendment."  The facts in that case are entirely inapposite to the facts here.  In McCoy,

after the suspect was already lying face-down on the ground with his hands behind his back, officers

performed a carotid restraint which rendered the suspect unconscious.  Id. at 1040.  Officers then

handcuffed the suspect's hands behind his back, zip-tied his feet together, and performed a revival

technique.  Id.  Once he regained consciousness, officers struck him more than ten times on his head,

shoulder, back, and arms.  Id.  Officers then placed the suspect in a second carotid restraint until he

was rendered unconscious again.  Id.  The Tenth Circuit found that the defendants' use of force after

the suspect's hands and feet were bound was unreasonable because he was effectively subdued, and

held that hitting him over the head multiple times violated clearly established law.  Id. at 1051.  A

reasonable officer would not consider the facts in McCoy analogous to the circumstances here.  The

17

court in <u>McCoy</u> found that the suspect was subdued because he was on the floor, bound at the hands and feet, and had been previously rendered unconscious by a carotid restraint; the Tenth Circuit in no way equated getting handcuffed as being "subdued." <u>Id.</u> In fact, the Circuit reiterated that "[w]hether an individual has been subdued from the perspective of a reasonable officer depends on the officer having enough time to recognize that the individual no longer poses a threat and react to the changed circumstances." <u>Id.</u> at 1058. <u>McCoy</u> does not establish that a reasonable officer would know that using a takedown maneuver against a suspect who is handcuffed, standing, swearing, and resisting arrest, constitutes an excessive use of force.

Plaintiff's reliance on <u>Perea v. Baca</u>, 817 F.3d 1198 (10th Cir. 2016), presents a similar issue. In <u>Perea</u>, officers drove after a suspect who was biking on the street, pushed the suspect off of his bicycle, did not tell the suspect why they had been following him, and never asked him to halt or stop. <u>Id.</u> at 1201. Officers threw the suspect off of his bike and reached for his hands in an attempt to detain him, but the suspect struggled and shouted. <u>Id.</u> Officers then used a taser against him, and tasered him a total of ten times. <u>Id.</u> The suspect stopped breathing and turned grey. <u>Id.</u> Officers performed CPR and the suspect began to breathe, but then he stopped breathing again and his pulse stopped. <u>Id.</u> He was transported to the hospital and pronounced dead. <u>Id.</u> The Tenth Circuit found that tasering the suspect ten times–in addition to two officers kneeling on top of him–"effectively subdued" the suspect, and that it is clearly established that continuing to taser a suspect after he had been subdued violated the Fourth Amendment. <u>Id.</u> The circumstances in <u>Perea</u> are not equivalent to the circumstances here, and no reasonable officer could interpret that case to clearly establish that performing a takedown maneuver when a defendant is handcuffed violates this clearly established

18

law.[21]  Plaintiff has failed to demonstrate that either of these cases clearly establishes that using force

after an individual has been handcuffed automatically violates the Fourth Amendment.[22]  The Court

therefore finds that defendant is entitled to qualified immunity for plaintiff's § 1983 claim for

excessive force in violation of the Fourth Amendment.

---

[21]     The Circuit even conceded that "some force would be justified to get [the suspect] under the officers' control."  <u>Perea</u>, 817 F.3d at 1203.

[22]     The parties also discuss the recent Tenth Circuit decision in <u>Surat v. Klamser</u>, 52 F.4th 1261 (10th Cir. 2022).  There, two officers were dispatched to a bar in response to a reported disturbance involving the plaintiff's boyfriend.  <u>Id.</u> at 1267.  When officers arrived, the plaintiff attempted to exit the bar and lightly bumped the officer as she walked past him.  <u>Id.</u> She attempted to leave with her boyfriend, and officers yelled that her boyfriend was not free to go.  <u>Id.</u>  A different officer began interviewing her boyfriend and the plaintiff again attempted to leave the bar.  <u>Id.</u>  The officer placed the plaintiff under arrest and held her by her wrist.  <u>Id.</u>  She attempted to pry his fingers off of her arm and he threw her to the ground to subdue her.  <u>Id.</u>  She sustained a concussion, cervical spine strain, contusions to her face, and bruising on her arms, wrists, knees, and legs.  <u>Id.</u>

The Tenth Circuit held "that the use of the takedown maneuver to slam to the ground a nonviolent misdemeanant who poses no immediate threat to the officer or others based on minimal resistance to arrest is unreasonable and constitutes excessive force under the Fourth Amendment."  <u>Id.</u> at 1276.  However, the Circuit held that <u>at the time the incident occurred in 2017</u>, "a reasonable officer would not have known that using a takedown maneuver to throw [a suspect] to the ground while she was resisting arrest for a nonviolent misdemeanor and not posing an immediate danger to [the officer] would violate the Fourth Amendment." Additionally, in <u>Surat</u>, the Circuit found that officers fell short on two <u>Graham</u> factors, and that plaintiff's misdemeanor offenses, minimal resistence, and non-threatening interaction with officers did not justify the officer's use of excessive force.  Here, plaintiff was suspected of committing a felonious offense, posed a higher threat to officers, and more forcefully resisted arrest.  More importantly, <u>Surat</u> was not decided until a year after the incident, and therefore was not clearly established law.

**B.    Plaintiff's § 1983 claim for unlawful arrest under the Fourth and Fourteenth**[23] **Amendments**

Plaintiff argues that defendant unlawfully arrested plaintiff in violation of the Fourth

Amendment, and is not entitled to qualified immunity.   Defendant attests that the initial handcuffing

of plaintiff was an investigatory detention supported by reasonable suspicion, and that regardless,

he had probable cause to arrest plaintiff for obstructing an officer.   Defendant also asserts that

plaintiff has not demonstrated that defendant violated clearly established law.

1.    Whether defendant unlawfully arrested plaintiff in violation of the Fourth Amendment

The Fourth Amendment protects the "right of the people to be secure ... against unreasonable

searches and seizures ...."  U.S. CONST. amend. IV.   "In addressing the constitutionality of an

investigative stop, the inquiry is twofold.  First, the officer's action must be 'justified at its

inception[;] [s]econd, the officer's action must be reasonably related in scope to the circumstances

which justified the interference in the first place." United States v. Neff, 300 F.3d 1217, 1220 (10th

Cir. 2002).  "An officer can stop and briefly detain a person for investigative purposes if the officer

has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even

---

[23]    Plaintiff alleges he was unlawfully arrest under the Fourth and Fourteenth Amendments in his amended complaint, but has alleged no facts supporting a substantive or procedural due process claim.  Both parties fail to address the Fourteenth Amendment aspect of plaintiff's unlawful arrest claim in their summary judgment briefings.  Regardless, it is the Fourth Amendment–rather than the due process protections of the Fourteenth Amendment–that govern plaintiff's claim for unlawful arrest, since he has failed to allege harm to his liberty beyond freedom from restraint.  See Shimomura v. Carlson, 811 F.3d 349, 361 (10th Cir. 2015); Champion v. McCalister, No. 23-6141, 2024 WL 3272239, at *3 (10th Cir. July 2, 2024) ("[H]is only reference to the Fifth and Fourteenth Amendments is in connection with his specific allegations implicating his Fourth Amendment rights. Accordingly, his Fifth and Fourteenth Amendment claims were properly dismissed.")  Additionally, because the Court has found that defendant had probable cause to arrest plaintiff, any claim under the Fourteenth Amendment necessarily fails.

if the officer lacks probable cause." Cortez v. McCauley, 478 F.3d 1108, 1115 (10th Cir. 2007). "Although [investigatory] stops are normally non-intrusive, we have indicated that law enforcement may (1) display some force, (2) place suspects on the ground, (3) use handcuffs, or (4) detain suspects in law enforcement vehicles, even in the absence of probable cause." Id. at 1130.  However, "[i]f a police-citizen encounter exceeds the limits of a [investigatory] stop, the detention becomes an arrest that must be supported by probable cause." Neff, at 1220.  "Instead of 'rigid criteria,' 'common sense and ordinary human experience' guide our analysis of the reasonableness of [investigatory] stops." Ellsworth v. City of Broken Arrow, Oklahoma, 850 F. App'x 619, 624 (10th Cir. 2021).

The initial handcuffing of plaintiff was an investigatory detention; it was only when plaintiff jerked away and defendant used a takedown maneuver that the seizure transformed into an arrest. See Plascencia v. Taylor, 514 F. App'x 711, 716 (10th Cir. 2013) ("Moreover, we are not alone among our sibling circuits in considering the use of force a factor in determining whether an investigatory stop becomes an arrest requiring probable cause.").  The Tenth Circuit has permitted the use of handcuffs during an investigative detention when officers can demonstrate "'that the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate.'" United States v. Albert, 579 F.3d 1188, 1193 (10th Cir. 2009) (quoting U.S. v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994)).  Officers were called to plaintiff's house due to a reported domestic incident, and when they arrived plaintiff appeared intoxicated, refused to allow officers to investigate the call, and then turned his back to walk towards the house where the presumed domestic incident took place. Cf. Cortez, 478 F.3d at 1123 ("No facts suggest [] that the [d]efendants or anyone else was somehow endangered by [the suspect].").  Defendant instructed

plaintiff multiple times to stop, and when he handcuffed plaintiff, he instructed plaintiff that he was being detained, not arrested.   Defendant had reason for caution in the early stages of the investigation, and plaintiff's behavior only escalated suspicion that criminal activity was afoot. Defendant's initial handcuffing of plaintiff was an investigative detention amply supported by reasonable suspicion.

Even if handcuffing plaintiff transformed the investigative stop to an arrest, the Court finds that defendant had probable cause to arrest plaintiff for obstruction of an officer.  In the context of a false arrest claim, "an arrestee's constitutional rights were violated if the arresting officer acted in the absence of probable cause that the person had committed a crime." Kaufman v. Higgs, 697 F.3d 1297, 1300 (10th Cir. 2012).  Probable cause exists when a police officer has sufficient information "to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964). This is an objective standard and a court must consider the totality of the circumstances to determine whether a reasonable officer would have believed there was probable cause to make an arrest. Koch v. City of Del City, 660 F.3d 1228, 1239 (10th Cir. 2011).  Probable cause "is measured at the moment the arrest occurs and must derive from facts and circumstances based on reasonably trustworthy information." Cortez, 478 F.3d at 1121. Once probable cause is established, a police officer is not required to search for exculpatory evidence before arresting a suspect.  Id.  A defendant is entitled to qualified immunity from a false arrest claim if there was "arguable probable cause" to make an arrest. Kaufman, 697 F.3d at 1300.  "Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." Stonecipher v. Valles, 759 F.3d 1134, 1141 (10th Cir. 2014).  "The proper inquiry in a § 1983 claim based on false arrest is not

whether the person arrested actually committed an offense, but whether the arresting officer had probable cause to believe that he had." Buck v. Rhoades, No. 21-CV-0295, 2023 WL 6221437, at *8 (N.D. Okla. Sept. 25, 2023) (quoting Crawford ex. rel. Crawford v. Kansas City, Kansas, 952 F. Supp. 1467, 1474 (D. Kan. 1997)).

The offense of obstructing an officer under Oklahoma law simply requires that a person delay or obstruct a public official in the performance of his or her duties, and plaintiff plainly delayed an ongoing investigation into a domestic violence incident by yelling at defendant and walking away from him and other officers. Under § 540, "[e]very person who willfully delays or obstructs any public officer in the discharge or attempt to discharge any duty of his or her office" is guilty of a misdemeanor. There is no requirement that a person use physical force against a police officer in order to commit an offense under this statute. Marsh v. State, 761 P2d 915, 916 (Okla. Crim. App. 1988). "[W]ords alone may suffice to support a conviction for Obstructing an Officer." Trent v. State, 777 P.2d 401, 402 (Okla. Crim. App. 1989). The Tenth Circuit has found that a person's actions constituting potential flight or the failure to comply with an order to halt qualifies as a violation of § 540. United States v. Sanchez, 555 F.3d 910, 919 (10th Cir. 2009). Conduct that delays or impedes a police officer's investigation of a domestic violence offense can provide a sufficient basis for an arrest under § 540. Tucker v. City of Oklahoma City, 2013 WL 5303730 (W.D. Okla. Sep. 20, 2013). Even though plaintiff was not ultimately charged with a domestic violence offense, Cici's report and plaintiff's conduct provided a sufficient basis for police to conduct an investigation at the scene. At a minimum, police officers had reasonable suspicion to briefly detain plaintiff while they investigated a possible domestic violence offense, and plaintiff's conduct during defendant's investigation gave rise to probable cause for plaintiff's arrest for

obstructing an officer.  Fields, 2023 WL 8643188, at *3 ("[The suspect] knew that he was the target of an investigation, and disobeyed orders to remain in the store. In addition, [his] presence in the parking lot, coupled with his demonstrated refusal to abide the officers' instructions, could have disrupted the questioning of [another suspect].[] The officers were justified in conducting an investigative detention and warrantless arrest.")

Plaintiff's argument in opposition to summary judgment on this claim is essentially that he had a right to walk away from officers on his own property, and that defendant's deposition testimony establishes that he was not in fear of his safety when he detained plaintiff.  However, the inquiry is whether there was probable cause to arrest plaintiff for obstructing an officer.  The Court must consider how a reasonable police officer would have viewed the facts and circumstances at the time plaintiff was arrested, and plaintiff's claims concerning defendant's subjective beliefs or intentions do not detract from the existence of probable cause in this case.  Defendant had an objectively reasonable belief that he had sufficient facts to warrant an investigation into a possible domestic violence incident, even if Julie subsequently changed or clarified her allegations.  Plaintiff's failure to comply with defendant's commands, not the validity of Julie's allegations, ultimately gave rise to his arrest for obstructing an officer, and defendant has established that he had probable cause to arrest plaintiff for this offense.  Plaintiff has failed to establish the existence of a constitutional violation, supporting the finding that defendant has qualified immunity from plaintiff's unlawful arrest claim.

2.      Whether placing plaintiff in handcuffs violated clearly established law

Even if the Court were to conclude the facts precluded summary judgment on the unlawful arrest claim, that right was not clearly established.  Plaintiff bears the burden of demonstrating that

"the contours of the right [are] sufficiently clear that a reasonable official would understand that what he doing violates that right." <u>Kaven</u>, 765 F.3d at 1194. "'In order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'" <u>Reavis estate of Coale v. Frost</u>, 967 F.3d 978, 992 (10th Cir. 2020) (quoting <u>Halley v. Huckaby</u>, 902 F.3d 1136, 1149 (10th Cir. 2018))

Plaintiff vaguely asserts that defendant violated clearly established law when he placed plaintiff in handcuffs, by arguing, "there is no law establishing that an officer responding to purported allegations is permitted to handcuff and arrest someone based solely on those vague allegations. Instead, the <u>Neff</u> and <u>Melendez</u> cases require a higher standard that there must be extenuating circumstances such as the fear of the person being armed." Dkt. # 49, at 21. This perfunctory argument fails to establish that defendant's conduct violated plaintiff's clearly established constitutional rights.

First, the cases that plaintiff refer to do not support his proposition. In <u>U.S. v. Neff</u>, 300 F.3d 1217 (10th Cir. 2002), the court specifically noted that "a Terry stop does not become unreasonable just because police officers use handcuffs on a subject or place him on the ground." <u>Id.</u> at 1220. The court reiterated that police officers should not take unnecessary risks in performing their duties, and can even take reasonable steps to protect their personal safety. While it is true that the plaintiff in <u>Neff</u> was suspected of being armed, the court noted that the "use of handcuffs was appropriate as long as there was a reasonable, articulable ground for fearing danger from the suspects." <u>Id.</u> at 1221. In <u>U.S. v. Melendez-Garcia</u>, 28 F.3d 1046 (10th Cir. 1994), the Circuit found that handcuffing was unreasonable because officers had no "reason to believe that these particular suspects had guns or

were violent or that the circumstances of this particular encounter warranted the unusual intrusiveness of handcuffing the defendants. . . ." <u>Id.</u> at 1053-53.  The Tenth Circuit reiterated that in some circumstances, methods such as handcuffing and pointing firearms may be warranted.  <u>Id.</u> In <u>Melendez-Garcia</u>, beyond being initially suspected of trafficking drugs, the suspects did not engage in any violent behavior or otherwise impede the officers' investigation.  These cases support the idea that some measures–such as handcuffs–are appropriate to ensure officer safety and perform an investigation, so long as they are proportional to the risk facing officers.

Plaintiff does not rely on any other cases to demonstrate that being placed in handcuffs violated a clearly established right, or that arresting him for the charge of obstructing an officer was unlawful.  In fact, a more recent Tenth Circuit case supports the opposite inference.  In <u>Culver v. Armstrong</u>, 832 F.3d 1213 (10th Cir. 2016), an officer witnessed a driver and passenger in a pickup truck turn off its headlights and drive over a sidewalk.  <u>Id.</u> at 1215.  The officer followed the vehicle in his patrol car for a few blocks and then pulled in front of the pickup truck, where he saw only the driver sitting inside.  <u>Id.</u> at 1216.  The officer exited the patrol car and asked the driver of the pickup where the other person was located.  <u>Id.</u>  The driver was evasive and admitted he had been drinking, so the officer instructed him to sit on the patrol car with his hands on the hood.  <u>Id.</u>  While this was occurring, the plaintiff appeared out of the dark, walking north on the sidewalk.  <u>Id.</u>  The plaintiff asked the officer what was going on, and the officer asked him if he had been in the car with the driver.  <u>Id.</u>  Plaintiff was evasive and continually asked "why?" and "I was just walking by man, leave me the fuck alone."  <u>Id.</u>  Plaintiff and the officer entered into an increasingly tense exchange, at which point the officer told plaintiff that if he was not in the truck, he should keep walking.  <u>Id.</u> Plaintiff ignored the officer so the officer commanded the plaintiff to come toward him, at which

26

point the plaintiff began swearing and shouted, "I'm not fuckin' doin' nothing!"  Id.  The officer

seized the plaintiff as he continued to protest, so the officer arrested him for public intoxication.  Id.

at 1217.  The judge dismissed the charge, and plaintiff sued the officer for unlawful arrest.  Id.  The

Tenth Circuit found that the officer had qualified immunity because he had probable cause to arrest

plaintiff based on the fact that plaintiff verbally interfered with an investigation, and under Wyoming

state precedent, verbal interference was sufficient to support a charge of interference with an

officer.[24]  Id. at 1218-19.  The Circuit concluded that the plaintiff had failed to illustrate that the

"unlawfulness" of defendant's conduct was clearly established, because defendant had probable

cause to arrest plaintiff under Tenth Circuit and Wyoming precedent.  Id. at 1219.  As noted above,

Oklahoma law similarly establishes that words alone can support an obstruction offense.  Trent, 777

P.2d at 402.  Accordingly, the law was not clearly established in plaintiff's favor, such that a

reasonable officer would have known that seizing plaintiff was against the law.  The Court therefore

finds that defendant is entitled to qualified immunity for plaintiff's § 1983 claim for unlawful arrest

in violation of the Fourth and Fourteenth Amendments.

**IV.**

   **IT IS THEREFORE ORDERED** that defendant's motion for summary judgment (Dkt. #

53) is **granted**.  A separate judgment is entered herewith.

---

[24]   The court noted "that [d]efendant cited plaintiff for public intoxication alone is inconsequential.  We measure probable cause against an objective standard.  That an officer may not have subjectively believed probable cause existed to arrest a suspect for a certain crime does not preclude the Government from justifying the suspect's arrest based on any crime an officer could objectively and reasonably have believed the suspect committed." Culver, 832 F.3d at 1218.

**IT IS FURTHER ORDERED** that defendant's motion in limine to strike/exclude plaintiff's expert witness (Dkt. # 59), and unopposed motion to strike hearings/deadlines (Dkt. # 60), are **moot**.

**DATED** this 22nd day of August, 2024.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

28